## MUTUAL INV. CO. v. SHULL.

Circuit Court of Appeals, Fourth Circuit. October 16, 1928.

No. 2747.

C. W. Tillett, of Charlotte, N. C. (Tillett, Tillett & Kennedy, of Charlotte, N. C., on the brief), for appellant.

John M. Robinson, of Charlotte, N. C. (Cansler & Cansler, of Charlotte, N. C., on the brief), for appellee.

Before WADDILL and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

NORTHCOTT, Circuit Judge. This is an action at law brought in the District Court of the United States for the Western District of North Carolina, by the Mutual Investment Company, a South Carolina corporation, appellant, and plaintiff below, against J. R. Shull, a citizen of North Carolina, appellee, and defendant below. Here the parties will be referred to according to the position they held in the court below. At the trial, the jury answered four issues for the defendant, and judgment was entered in his favor, from which judgment this appeal was taken.

The action was instituted to recover on two negotiable promissory notes signed by the defendant, and payable to the plaintiff. The defendant was a practicing physician at Charlotte, N. C., and was approached by one McGhee, who sold him certain Florida real estate, under the following contract:

"This agreement made and entered into this the 8th day of August A. D. 1925 by and between the McGhee Interests, Inc., of Tampa, Fla., a Florida corporation, party of the first part, and J. R. Shull, M. D., party of the second part, witnesseth:

."That whereas the party of the first part has sold and by these presents does sell to the party of the second part lots numbered 2, 3, 4, 5 and 6 in Block 32, of Edgemore Estates in the City of St. Petersburg, Florida, as appearing in the public records of Pinellas, Florida, for a consideration of Ten Thousand Dollars, upon the following conditions, to wit: one half cash, the receipt of which is hereby acknowledged by the party of the first part, the balance to be paid when the property shall have been sold for the account of the party of the second part by the party of the first part as hereinafter mentioned.

"Therefore, it is mutually agreed and understood by and between the parties hereto that the party of the first part shall sell for the account of the party of the second part on or before six months from date the property hereinbefore mentioned, at an advance of at least 25% of the purchase price hereinabove mentioned, and in the event that the party of the first part fails so to do, it is hereby understood and agreed that the party of the first part shall then repurchase said property at an advance of 25%.

"It is further understood and agreed that the party of the first part acting as selling agent for the party of the second part shall use its best efforts and endeavors towards obtaining as high a price as possible for the aforementioned property and that the entire proceeds of such sale even over and above 25% as hereinbefore mentioned to be turned over to the party of the second part.

"Time is of the essence of this contract and it shall be binding upon the heirs, assigns and administrators of both parties hereto.

"Witness our hands and seals the day and year first above mentioned. The McGhee Interests, Inc. by J. Rutledge McGhee, Pres., Party of the First Part. J. Rush Shull, Party of the Second Part.

"Signed, Sealed and Delivered in the presence of: Forest J. Weisel, Mrs. R. P. Brown."

The agreement to sell or repurchase the land was never carried out.

The notes sued on were given in lieu of the cash consideration mentioned in the agreement, and were first made payable to the McGhee Interests, Inc. C. L. Cobb, a resident of South Carolina, was a banker, at Rock Hill, in that state, and was the executive officer and chief owner of the plaintiff company. McGhee, who secured the notes from the defendant, approached Cobb with the purpose of selling or discounting the notes to him. Cobb knew McGhee, and had had business transactions with him before that time, and in his evidence admitted that he knew McGhee to be unscrupulous in his business dealings. McGhee at that time was indebted to Cobb's bank, in the sum of $300, which Cobb had been unable to collect, though he had repeatedly endeavored to do so. At the time McGhee approached Cobb with the notes of defendant, he (McGhee) also tried to interest Cobb in the purchase of Florida property under a contract similar to the Shull contract. Cobb refused to invest, and also refused to purchase Shull's notes as long as they were payable to McGhee or the McGhee company, but did finally agree to purchase the notes at a discount of $1,000, provided they were made payable directly to Cobb's company, the plaintiff. $300 of the $1,000 discount was to be applied to the payment of McGhee's pre-existing debt of $300. The notes only ran six months, and the rate of discount was unusually high.

Cobb had inquiry made at Charlotte, N. C., where defendant lived, and was informed that the defendant was thoroughly reliable and responsible for the amount of the notes. McGhee procured the defendant to sign new notes with the name of the payee left blank. The name of the plaintiff was written in the notes as payee, after they were signed, and McGhee was paid for them the $4,000 agreed on.

There was testimony at the trial, by one witness, that when McGhee approached Cobb to sell him the notes, the entire transaction between McGhee and defendant was explained to Cobb, and that the contract between McGhee Interests, Inc., and the defendant was shown Cobb, or at least placed on his desk. This testimony was denied by Cobb, but the jury evidently believed the witness, and disbelieved Cobb. This attempt on Cobb's part to conceal what he had done supports the finding of the jury, hereinafter referred to, that he acted in bad faith.

The following issues were submitted to the jury, and the following findings made by it:

1. Was the defendant induced to execute the notes sued on in this action upon the false and fraudulent representations alleged in the answer? Answer: Yes.

2. If so, did the plaintiff, at and before acquiring said notes, have notice of such fraud? Answer: Yes.

3. Was it agreed between the defendant and J. Rutledge McGhee, president of McGhee Interests, Inc., at and before the execution of said notes, that said notes would either be paid from the proceeds of the sale of said lots in Edgemore Estates, or, in default

of the resale of said lots by said corporation, that said notes would be canceled and returned to the defendant as alleged in the answer? Answer: Yes.

4. If so, did the plaintiff at and before acquiring said notes have notice of such agreement? Answer: Yes.

5. In what amount, if any, is the defendant indebted to the plaintiff? Answer: Nothing.

Forty-one exceptions were taken by the plaintiff, some of which have been abandoned, and a number of which, a study of the record shows, are not important. The main point relied upon by the plaintiff is that the notes were negotiable, were held by the plaintiff as holder in good faith, and that Cobb, the owner of plaintiff company, had no such notice of any infirmity in the notes as would defeat recovery by the plaintiff.

Had the notes in question been presented to Cobb and purchased by him without any information whatever, a different case would be presented, and appellant's contention as to the application of the Negotiable Instrument Law of North Carolina (C. S. § 2976 et seq.) would be sound, but such is not the situation as found by the jury. The notes were presented to Cobb by a man known to him as being unreliable, and with full details as to the transaction. Cobb refused to enter into a similar contract for any sum, but after maneuvering so as to get the notes as far removed from the fraudulent contract as possible, by having new notes made with a different payee, purchased them at a large profit. The jury found that Cobb had full knowledge of the transaction, and there was evidence, if believed by the jury, ample to sustain that finding.

Cobb knew that McGhee was not trustworthy, and had defrauded him (Cobb), knew that he had been unable to collect a small debt from him, even refused to handle the notes with McGhee's name in any way connected with them. Cobb would have acted the much better part had he sent his agent to Dr. Shull to warn him of the transaction, rather than maneuvering, as he did, to secure new notes to be purchased at a large profit to himself.

█ It is contended on behalf of appellant that it could not be chargeable with notice of fraud or other wrong about which appellee himself knew nothing whatever. We cannot agree with this view. Cobb, appellant's agent and owner, was an able and experienced banker, who should have known at once that a contract like the one on which the notes were secured was on its face a fraud. Cobb's experience as a banker would at once put him upon notice of the fraud being perpetrated on the defendant, who was a practicing physician, having no previous knowledge of McGhee's unreliability, and evidently ignorant of the things that an experienced banker would know at a glance.

█ While it is true that one who purchases a negotiable note for value before maturity does not owe the maker the duty of making active inquiry into the origin or consideration of the note before purchasing the same, yet it is also true that where it is shown that the purchaser had actual notice of facts, or willfully disregarded facts available that impeached the validity of the paper, and where the jury finds upon proper evidence that the action of the purchaser amounts to bad faith, he cannot recover. Clark v. Evans (C. C. A.) 66 F. 264; Murray v. Lardner, 2 Wall. 110, 17 L. Ed. 857; Hotchkiss v. Nat. Shoe & Leather Bank, 21 Wall. 354, 22 L. Ed. 645; Kneeland v. Lawrence, 140 U. S. 209, 11 S. Ct. 786, 35 L. Ed. 492.

"The rule may perhaps be said to resolve itself into a question of honesty or dishonesty, for *guilty knowledge and wilful ignorance* alike involve the result of bad faith. They are the same in effect. Where there is no fraud there can be no question. The circumstances mentioned, and others of a kindred character, while inconclusive in themselves, are admissible in evidence, and *fraud established, whether by direct or circumstantial evidence, is fatal to the title of the holder.*" Murray v. Lardner, 2 Wall. 110, 17 L. Ed. 857, supra. See, also, 3 R. C. L. p. 1095.

█ The question of the bad faith of the purchaser is a question of fact for the jury. Goodman v. Simonds, 61 U. S. 343, 15 L. Ed. 934.

The trial court cannot invade the province of the jury, whose duty it is to decide disputed questions of fact, nor can we. As was well said by Judge Parker in delivering the opinion of this court in Chesapeake & O. R. Railway Co. v. Waid (C. C. A.) 25 F. (2d) 366: "Of course, there is much testimony in contradiction of the testimony offered by plaintiff; but, as we said in our former opinion, we are not here to weigh evidence."

█ The finding of the jury, which there was ample evidence to sustain, was a finding that the appellant in the purchase of the notes had acted in bad faith. The jury was not only justified in its findings, but it is difficult to see from the record how it could have reached any other conclusion. We agree with the statement in brief for appellee, that the cir-

cumstances surrounding the purchase of the notes clearly show an effort on the part of Cobb to "insulate" them from McGhee and the McGhee transaction with the defendant.

[5] The judgment should be affirmed on another ground. The agreement for the sale of the land by McGhee to Shull, and the resale or purchase back by the former within six months at a profit of 25 per cent., was contemporaneous with Shull's notes payable to the McGhee interests six months after date. The contract and the notes were clearly parts of the same transaction and the notes were not to be paid by Shull unless McGhee carried out his part of the agreement. The substitution of notes payable in blank, which were transferred to Cobb, did not alter the nature of the contract. There was direct testimony that Cobb was told by McGhee that he had promised either to resell the land or to redeem the notes at an advance of 25 per cent. This testimony justified the finding of the jury on the third issue. Cobb therefore had knowledge that the notes were not unconditional promises to pay, but were dependent upon the consummation of the contract. Having taken the notes with notice of this infirmity, Cobb cannot now recover thereon.

The charge of the learned trial judge was eminently fair, there was no reversible error in the trial, and the judgment of the court below is accordingly affirmed.